IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

AMERICAN FAMILY MUTUAL INS. CO.,

6000 American Parkway

Madison, WI 53783

SECURA INSURANCE COMPANY,

1500 Mutual Way

Neenah, WI 54956

MT. MORRIS MUTUAL INSURANCE COMPANY

N1211 County Road B

Coloma, WI 54930

WEST BEND MUTUAL INSURANCE COMPANY

1900 S 18th Avenue

West Bend, WI 53095

RYAN and AUBREE RALPH,

3320 Arbor Vitae Land

Plover, WI 54467

WILLIAM and ALOHA SEITZ,

206 Golden Rod Drive

Stevens Point, WI 54482

BRIANA SCHOCK,

1503 85th Avenue

Amery, WI 54001

JEAN WESLEY

2946 N Farwell Avenue

Milwaukee, WI 53211

      Plaintiffs,

v.

MJC AMERICA, LTD.

280 S. Lemon Avenue #1507

Walnut, CA 91788

GREE USA, INC.
4195 Chino Hills Parkway #1026
Chino Hills, CA 91709

HONG KONG GREE ELECTRIC APPLIANCE SALES, LTD.
Unit 2612 Miramar Tower
132 Nathan Road
Tsin Sha Tsui Kowloon, Hong Kong

GREE ELECTRIC APPLIANCES, INC. OF ZHUHAI
Jinji Road West
Qianshan Zhuhai Guang Dong, 51907 China

   Defendants.

---

## COMPLAINT

---

  The plaintiffs, for their complaint against the above-named defendants, state:

### PARTIES

#### *Plaintiffs*

1. American Family Mutual Insurance Company ("American Family") is incorporated under the laws of the State of Wisconsin. Its principal place of business where its officers and directors control the company's operations is located at 6000 American Parkway, Madison, Wisconsin.

2. Secura Insurance Company ("Secura") is incorporated under the laws of the State of Wisconsin. Its principal place of business where its officers and directors control the company's operations is located at 1500 Mutual Way, Neenah, Wisconsin.

3.  Mt. Morris Mutual Insurance Company ("Mt. Morris") is incorporated under the laws of the State of Wisconsin. Its principal place of business where its officers and directors control the company's operations is located at N1211 County Road B, Coloma, Wisconsin.

4.  West Bend Mutual Insurance Company ("West Bend Mutual") is incorporated under the laws of the State of Wisconsin. Its principal place of business where its officers and directors control the company's operations is located at 1900 S. 18th Avenue, West Bend, Wisconsin.

5.  Ryan and Aubree Ralph are husband and wife who reside 3320 Arbor Vitae Land, Plover, Wisconsin.

6.  William and Aloha Seitz are husband and wife who reside at 206 Golden Rod Drive, Stevens Point, Wisconsin.

7.  Briana Schock is an adult resident of Wisconsin who resides at 1503 85th Avenue, Amery, Wisconsin.

8.  Jean Wesley is an adult resident of Wisconsin who resides at 2946 N Farwell Avenue, Milwaukee, Wisconsin.

### *Defendants*

9.  MJC America, Ltd., ("MJC America") is a company incorporated under the laws of the State of California. Its principal place of business where its officers and directors control the company's operations is located at 280 S. Lemon Avenue #1507, Walnut, California.

10. Gree USA, Inc. ("Gree USA") is a company incorporated under the laws of the State of California. Its principal place of business where its officers and directors control the company's operations is located at 4195 Chino Hills Parkway #1026, Chino Hills, California.

11. Hong Kong Gree Electric Appliance Sales, Ltd. ("Gree Hong Kong") is a Hong Kong, China, business entity that most resembles the U.S. business form of a corporation, with its principal place of business located at Unit 2612 Miramar Tower, 132 Nathan Road, Tsin Sha Tsui Kowloon, Hong Kong, S.A.R. Gree Hong Kong is a citizen of the People's Republic of China.

12. Gree Electric Appliances Inc. of Zhuhai ("Gree China") is a Chinese business entity that most resembles the U.S. business form of a corporation, with its principal place of business located at West Jinjixi Road, Zhuhai, China and is a citizen of the People's Republic of China.

## JURISDICTION AND VENUE

13. The amount in controversy is over $75,000.00

14. This court has subject matter jurisdiction over this matter:

   a. Under 28 U.S.C. §1332 because all plaintiffs are citizens of a state (incorporated, headquartered and residing in Wisconsin) diverse from the states in which all defendants are incorporated and their principle places of business (California and China).

   b. Under 28 U.S.C. §1331 because the fourth cause of action below arises from a law of the United States. This court has pendent jurisdiction over the remaining causes of action.

15. This case arises from a series of fires described below and listed in Exhibit A. In each fire, plaintiff American Family insured some of the property damaged by the fire.

   a. Pursuant to FRCP 18, it is bringing all of these claims in this action.

b. The remaining plaintiffs owned or insured property that was damaged in the various fires listed in Exhibit A. They are property parties to this action pursuant to FRCP 19(a)(1)(B) (i) and (ii), and FRCP 20(a)(1)(A) and (B).

16. This court has personal jurisdiction over the defendants because:

a. They have purposefully availed itself to the benefit of the laws of this judicial district by regularly transacting and/or conducting business in the State of Wisconsin.

b. The majority of the damages claimed by the plaintiffs were sustained in Wisconsin.

17. Service of process upon Gree China and Gree Hong Kong can be accomplished in the United States and without implicating the Hague Convention, as demonstrated in at least the following cases in which Gree China and/or Gree Hong Kong were served in the United States, filed motions to dismiss for improper service, and the motions were denied, service being deemed proper: *State Farm Fire & Cas. Co. v. Gree USA, Inc*., No. 3:18-CV-349 RLM-MGG, 2019 WL 4674611 (N.D. Ind. Sept. 25, 2019); *Erie Ins. Exch. v. Gree USA, Inc*., No. 3:CV-18-2126, 2019 WL 1405854 (M.D. Pa. Mar. 28, 2019); *Nationwide Mut. Ins. Co. v. Gree USA, Inc.*, No. CV 18- 1105, 2019 WL 1244093 (W.D. Pa. Mar. 1, 2019), report and recommendation adopted, No. CV 18-1105, 2019 WL 1243280 (W.D. Pa. Mar. 18, 2019); *Nationwide Prop. & Cas. Ins. Co. v. Gree USA, Inc*., No. 2:18-CV-00881, 2018 WL 6419955, (S.D. Ohio Dec. 6, 2018); *Nationwide General Insurance Company v. Gree USA, Inc., et al.*, 3:18-cv-12607 (E.D. Mi. November 7, 2018). The Hague Convention is not implicated when service of process is made in the United States, not abroad.

18. Venue is proper pursuant to 28 U.S.C. §1391(b)(2) because some of the events giving rise to this claim, and the property involved, were located in Rock County, Wisconsin.

## FACTS REGARDING THE DEHUMIDIFIERS

### *Background — the joint venture with MJC America*

19. Gree China is a Chinese manufacturer of appliances, including dehumidifiers. At all times relevant to this complaint, the majority of Gree China was owned by Zhuhai Gree Group Co., Ltd, which is a Chinese state-owned enterprise. According to publicly available information, Zhuhai Gree Group was owned and supervised by the State-owned Assets Supervision and Administration Commission (SASAC) of Zhuhai local government. Gree China has annual sales of more than $28 billion dollars.

20. Gree Hong Kong is a wholly owned subsidiary of Gree China. Its purpose is to serve as an expert hub for Gree China, which directs and controls all of Gree Hong Kong's activities.

21. Prior to 2010, Gree China conceived a plan to dominate the American residential dehumidifier market by partnering with an American distributor. That distributor was defendant MJC America.

22. Prior to its involvement with its co-defendants, MJC America distributed dehumidifiers and other home comfort products from the manufacturers to the retailers.

23. Gree China and MJC America engaged in negotiations through August 2010. Throughout these negotiations, Dong Mingzhu and Larry Lam, on behalf of the Gree China Entities, repeatedly asserted to Jimmy Loh and Charley Loh, the CFO and CEO of MJC America, respectively, that all products to be sold by Gree USA, including the dehumidifiers, were high quality, met applicable safety standards and were appropriate for sale under the regulatory requirements in the United States, and had significant sales potential. The dehumidifiers were to be the primary product sold by Gree USA and thus crucial to its

success. Based on the representations of Dong Mingzhu and Larry Lam, MJC America

decided to form Gree USA with the Gree China Entities.

24. On April 23, 2010, Gree Hong Kong (under the control and direction of Gree China) and

MJC America entered into an agreement that formed Gree USA.  The sole purpose of Gree

USA's existence was to serve as the American sales arm of Gree China.

25. MJC America agreed that it would transfer its customer accounts, which included several

large household product brands, to Gree USA. MJC America was to provide sales and

marketing services for Gree USA.

26. On April 26, 2010, Gree USA was incorporated in California.  Gree Hong Kong owned 51%

of Gree USA, and an MJC America subsidiary (MJC Holdings, now dissolved) owned the

remaining 49%.

27. Gree USA's sales immediately skyrocketed. In 2012, Gree USA sold over 1.2 million units of

air conditioners and dehumidifiers, with sales totaling over $150 million. Critical to this

success was the fact that, as requested by the Gree China Entities, MJC America transferred

to Gree USA all of its major accounts.

*Falsification of UL Certification*

28. Gree China and Gree Hong Kong represented to MJC, Gree USA, retailers and the general

public that its dehumidifiers were certified by Underwriter's Laboratory ("UL") and that the

design and materials used in the manufacturing of its dehumidifiers complied with UL

Standard 474 and Standard 94.

29. As part of the UL certification process, Gree China and Gree Hong Kong made representations to UL that the plastics used in the construction of its dehumidifiers complied with the fire ratings in UL 94.

30. UL 94 requires that consumer electric products, including dehumidifiers, use plastics that have specific burn and flame rates in order to prevent, reduce and limit the risk of fire hazards.

31. In its application for UL certification under UL 474, Gree China represented that the materials and plastics used to manufacture and construct its dehumidifiers were compliant with UL 94.

32. Gree China and Gree Hong Kong made these false and misleading representations knowing that the materials and plastics used to manufacture and construct its dehumidifiers were not compliant with UL 94's burn and flame rate requirements.

33. Gree China and Gree Hong Kong made these false and misleading representations knowing that UL was unable to independently conduct the burn/flame resistance testing set forth in UL 94, and that UL relied on Gree China's representations in the certification documents stating that Gree China had these tests performed and the dehumidifiers complied with UL 94.

34. US retailers will not purchase and sell dehumidifiers that are not certified by UL.

35. US consumers will not and cannot purchase dehumidifiers that are not certified by UL because US retailers will not purchase or sell non-UL listed electric products.

36. Gree China's and Gree Hong Kong's falsification of the UL Certification process was done for the purposes of misleading UL into improperly certifying the dehumidifiers and, in so

doing, Gree China and Gree Hong Kong defrauded and misled US retailers and consumers into purchasing its dehumidifiers on the false belief that the dehumidifiers were designed and manufactured in compliance with UL standards.

*Gree China's knowing sale of defective dehumidifiers*

37. From 2008 until the present time, Gree China was an original equipment manufacturer for General Electric branded dehumidifiers.

38. In late 2010, GE instructed Gree China to make certain design changes and product improvements to GE branded dehumidifiers that Gree China manufactured.

39. The design changes were mandated by GE due to product failure issues with the dehumidifiers, including overheating issues and fires.

40. The GE mandated design changes required a) the removal of electrical terminal sleeves that used PVC materials; b) the use of UL 94 V0 rated plastics for structural components of the dehumidifiers, including the fan shroud base, center support and external cabinet; and c) the use of UL 94 flammability rated materials for the terminal cover.

41. Starting in its January 2011 production run, Gree China made the above requested changes for GE dehumidifiers.

42. Gree China did not make the GE mandated design changes for dehumidifiers manufactured under other brand names, including the dehumidifiers that it was manufacturing and selling to Gree USA.

43. Gree China did not make the GE mandated design changes despite actual knowledge that the design and materials defects identified by GE were causing Gree China's dehumidifiers to fail, overheat, and catch on fire.

9

44. The defendants knowingly sold over 1,000,000 dehumidifiers in the United States that they knew were defective because they did not incorporate the GE mandated design and materials changes.

*Response to reports of fires*

45. In July of 2012, after receiving an unusually high number of consumer complaints, after having witnessed a YouTube video showing a SoleusAir by Gree dehumidifier in flames, and after being contacted by the United States Consumer Product Safety Commission ("CPSC") to respond to a consumer complaint of a dehumidifier that overheated and emitted smoke, MJC America became concerned that the Gree China manufactured dehumidifiers were fire safety hazards.

46. In response to these concerns, Charlie and Jimmie Loh, the owners of MJC America and officers and directors of Gree USA contacted Gree China to express their concerns and to request technical and engineering assistance.

47. In addition, MJC America requested that Gree China test the dehumidifiers to determine the cause of the overheating and fires. MJC America also informed Gree China that the CPSC treats appliance fires very seriously and that manufacturers typically recall appliances such as dehumidifiers after receiving only a few complaints of products having caught on fire.

48. From July of 2012 until September 2012, Gree China and Gree Hong Kong responded to the concerns expressed by the Lohs by stating that the product was not defective and was not causing fires despite Gree China's actual knowledge of the falsified UL certification and the GE mandated design changes.

49. On or around August 9, 2012, MJC America shipped certain of the dehumidifiers that had reportedly overheated and/or caught fire to Gree China for further investigation.

50. In September 2012, employees of Gree China and Gree Hong Kong, at the direction of Madam Dong, traveled to California to meet with the Lohs and others employees of MJC America and Gree USA for the purposes of discussing the dehumidifier safety issues.

51. During the September 2012 meeting, Larry Lam, an employee of Gree Hong Kong, and an engineer known as Ju from Gree China, informed the Lohs that Gree China and Gree Hong Kong were aware that the plastics used in constructing the dehumidifiers were not compliant with UL 94 and UL 474.

52. In this meeting, Larry Lam and engineer Ju admitted that Gree China knowingly submitted test sample dehumidifiers to UL which did not comply with UL 94 and UL 474 because Gree China knew that UL relied on manufacturers to test their products for UL 94 burn rate compliance and that UL would not conduct independent burn rate testing on Gree China's dehumidifiers.

53. At the conclusion of the meeting, Gree China, Gree USA, MJC America and Gree Hong Kong agreed not to recall their defective products, or to report the defective design and defective materials issues to the CPSC, its retail customers or the general public to avoid adverse publicity and loss of sales.

54. The decision not to recall their defective products was based on the instructions given from Gree China and Gree Hong Kong to Gree USA and MJC America.

55. As part of this decision, Gree China and Gree Hong Kong wanted to delay any recall until 2013 so that Gree China could continue to capture market share and sales and so that Gree

China had time to change its manufacturing lines and supply chains to incorporate the design changes and then to use fire resistant materials.

56. From September of 2012 until November/December of 2012, Gree USA and MJC America continued to receive consumer complaints of overheating and fires caused by their dehumidifiers. In response to the growing concerns over product safety, Gree USA and MJC America placed a temporary hold on sales of dehumidifiers to retailers and warehoused thousands of dehumidifiers.

57. On or around October 30, 2012, MJC America sent two new dehumidifiers along with one that overheated to Intertek Testing Services NA, Inc. ("Intertek"), a multinational inspection, product testing, and certification company, to conduct its own tests regarding what was causing the dehumidifiers manufactured by Gree China to overheat and/or catch fire. Intertek reported to MJC America that there was a design error with respect to the compressor overload protector for smaller capacity dehumidifiers (45 pints and smaller). Shortly thereafter, on or around November 23, 2012, MJC America informed Gree China that it would stop selling dehumidifiers of that size. Gree China subsequently disputed Intertek's report and demanded that MJC America lift its stop-sale order.

58. In December of 2012 or January of 2013, after Gree China and Gree Hong Kong insisted and pressured MJC America and its officers and directors, Gree USA, MJC America and Gree USA released the temporary hold on sales of dehumidifiers to the retailers.

59. As part of MJC America's and Gree USA's agreement with Gree China and Gree Hong Kong to release the temporary hold, Gree China agreed to defend and indemnify MJC for any losses.

*The September 2013 recall*

60. It was not until February 20, 2013, after MJC America's legal counsel requested that Gree China join MJC America in reporting the dehumidifier issues to the CPSC and informed Gree China of the substantial penalties it could potentially face for its failure to report, that Gree China agreed to submit a report to the CPSC concerning the dehumidifier problems. However, on information and belief, Gree China failed to provide to the CPSC all material information concerning the non-fire retardant materials used to manufacture the dehumidifiers at issue.

61. Thereafter, on or around April 9, 2013, MJC America sent four randomly selected dehumidifiers manufactured in 2010, 2011, and 2012 to CRT Laboratories, Inc. ("CRT"), a leading failure analysis laboratory, to test the flammability of the plastic used to construct the dehumidifiers. On April 30, 2013, MJC also sent two dehumidifiers manufactured in 2013 to CRT for flammability testing.

62. In a report dated May 10, 2013, CRT concluded that all four units manufactured in 2010, 2011, and 2012 failed to meet the applicable fire retardant material standards.

63. On or around June 13, 2013, Gree China finally issued a stop-sale order on all the humidifiers manufactured from January 2010 through 2012.

64. Finally, on September 12, 2013, the CPSC announced a massive recall ("Recall 13-283") of the dehumidifiers manufactured by Gree China since late-2009 because they posed what the CPSC termed "serious fire and burn hazards."

65. As discussed below, while Recall 13-283 included the recall of 2,200,000 defective dehumidifiers, the scope of Recall 13-283 did not include all of the defective dehumidifiers

that Gree China manufactured and caused to be imported into the United States. As of September 12, 2013, Gree China was still manufacturing and selling, and Gree USA was still importing into the United States, defective dehumidifiers.

*The January 2014 Recall*

66. On January 30, 2014, the Consumer Product Safety Commission issued an announcement regarding the dehumidifiers that the defendants were selling that stated the following:

> The firm has received 16 reports of incidents with the recalled GE-brand dehumidifiers, including 11 reports of overheating with no property damage beyond the units, and 5 reports of fires beyond the units which were associated with about $430,000 reported in property damage. This is in addition to more than 71 fires and $2,725,000 in property damage reported with other brands of Gree-manufactured dehumidifiers in the previous recall.

67. The CPSC then announced a new recall covering an additional 350,000 units (recall 14-095).

*The May 2014 Recall*

68. On May 15, 2014, the Consumer Product Safety Commission issued an announcement regarding the dehumidifiers that the defendants were selling that stated the following:

> The number of reported incidents of overheating dehumidifiers has increased nearly 400 percent from 119 in the original recall (September 2013) to 471 reported incidents. The number of reported fires has increased more than 200 percent from 46 to 121 reported fires. Property damage reports have more than doubled from $2.15 million in the original recall to nearly $4.5 million.

69. The CPSC then announced that the recall was once again being expanded to include over 2,500,000 units (recall 14-179).

*The November 2016 recall*

70. On November 29, 2016, the CPSC issued an announcement regarding the dehumidifiers that

the defendants were selling that stated:

> There have been more than 2,000 reported incidents of
> dehumidifiers overheating. About 450 fires have been reported,
> resulting in more than $19 million in property damage.

71. The CPSC then announced another recall (recall 17-039).

*CPSC Civil Penalty*

72. On March 25, 2016, the CPSC issued an announcement in which it stated that it had imposed

a $15,450,000 penalty on Gree China, Gree Hong Kong and Gree USA for the following

reasons:

> The penalty settles charges that Gree:
>
> • knowingly failed to report a defect and unreasonable risk of
>   serious injury to CPSC immediately (within 24 hours) with
>   dehumidifiers sold under 13 different brand names, including
>   Frigidaire, GE, Gree, Kenmore and Soleus Air, as required by
>   federal law;
>
> • knowingly made misrepresentations to CPSC staff during its
>   investigation; and
>
> • sold dehumidifiers bearing the UL safety certification mark
>   knowing that the dehumidifiers did not meet UL flammability
>   standards.
>
> Gree's dehumidifiers had a defect that caused the machines to
> overheat and catch fire. Despite Gree receiving multiple reports
> of incidents, and despite making design changes to fix the
> problem, Gree failed to report the defect to CPSC immediately.
> Gree also failed to report the incidents or the design changes to
> CPSC immediately. These incidents began in July 2012 and
> caused nearly $4.5 million in property damage.

*This lawsuit's fires*

73. This lawsuit arises from multiple fires caused by dehumidifiers designed, engineered, manufactured, imported and sold by the defendants.

74. Attached to this complaint as Exhibit A is a list of the fires that caused damages being claimed in this lawsuit.

75. As indicated in Exhibit A, the insurer plaintiffs insured various homes damaged by dehumidifier fires. In each case, the insurers paid for the damages caused by the fire, and are subrogated to the rights of their insureds to the extent of their payments.

76. Plaintiffs Ryan and Aubree Ralph, William and Aloha Seitz, Briana Schock and Jean Wesley each sustained damages from dehumidifier fires in excess of their insurance policy limits, and thus are asserting claims for damages independent from, and in addition to, the insurers' subrogation claims.

77. The damages caused by the fires identified in Exhibit A are liquidated and liquidable. There is a reasonably certain standard of measurement by the correct application of which one can ascertain the amount of the damages.

### FIRST CAUSE OF ACTION: PRODUCT LIABILITY

78. The preceding paragraphs are incorporated herein by reference.

79. The defendants designed, engineered, manufactured, introduced into the stream of commerce, imported and sold the dehumidifiers that caused the fires listed in Exhibit A.

80. The dehumidifiers contained one or more design and/or manufacturing defects with foreseeable risks which could have been avoided by the adoption of a reasonable alternative design. Specifically, the defects include the following:

    a.   They failed to use fire retardant plastic for the dehumidifier bodies with a UL94 rating of V-0.

    b.   They used conductor insulation that contained plasticizer that leached out at temperatures inside the dehumidifier which were foreseeable and in the presence of moisture which, in a dehumidifier, is foreseeable.

    c.   They located the thermal overload protector in proximity to the plasticizer-leaching conductor insulation, resulting in the plasticizer preventing the thermal overload protector from functioning as intended

81. The defects caused each of the dehumidifiers to spontaneously combust, resulting in the damages being claimed.

82. The dehumidifiers' defective condition rendered them unreasonably dangerous to the owners' property.

83. The defective condition of the dehumidifiers existed at the time they left the control of the defendants.

84. The dehumidifiers reached their respective owners without substantial change in the condition in which they were sold.

<u>**SECOND CAUSE OF ACTION: NEGLIGENCE**</u>

85. The preceding paragraphs are incorporated herein by reference.

86. The defendants owed the plaintiffs and their insureds a duty to use reasonable care when they designed, engineered, manufactured, sold, and submitted for testing to UL the dehumidifiers that ultimately were punched by the plaintiffs and their insureds.

87. The defendants breached their duty in the following and other ways:

a. They failed to use fire retardant plastic for the dehumidifier bodies with a UL94 rating of V-0.

b. They used conductor insulation that contained plasticizer that leached out at temperatures inside the dehumidifier which were foreseeable and in the presence of moisture which, in a dehumidifier, is foreseeable.

c. They located the thermal overload protector in proximity to the plasticizer-leaching conductor insulation, resulting in the plasticizer preventing the thermal overload protector from functioning as intended.

d. They failed to stop selling, and recall, the dehumidifiers upon learning that they were causing fires.

88. The foregoing breaches of the defendants' duty were a cause of the fires and resulting damages.

### THIRD CAUSE OF ACTION: INTENTIONAL MISREPRESENTATION

89. The preceding paragraphs are incorporated herein by reference.

90. The defendants made a representation of fact that the dehumidifiers they were selling were listed by UL and met all listing requirements of the UL listing.

91. The representation was false. The plastic used in the dehumidifiers did not meet the requirements of the UL listing.

92. The defendants knew the representation was false when they made it. They knew the plastic they were using in the dehumidifiers purchased by the plaintiffs and their insureds was not rated as required by UL.

93. The defendants made the representation with the intent to deceive the plaintiffs and their

insureds, and to induce them into purchasing the dehumidifiers.

94. The plaintiffs and their insureds believed the representation to be true, believed the

dehumidifiers were UL listed, and relied on the defendants' representation to their detriment.

## FOURTH CAUSE OF ACTION: 15 U.S.C. §2072

95. The preceding paragraphs are incorporated herein by reference.

96. The Consumer Product Safety Commission has promulgated the following rule at 16 CFR

§1115.6:

> §1115.6    Reporting of unreasonable risk of serious injury or
> death.
> (a) General provision. Every manufacturer, distributor, and
> retailer of a consumer product distributed in commerce who
> obtains information which reasonably supports the conclusion
> that its product creates an unreasonable risk of serious injury or
> death is required to notify the Commission immediately. 15
> U.S.C. 2064(b)(3).

97. The defendants willfully and knowingly violated the foregoing rule.

98. The plaintiffs and their insureds sustained damages by reason of the defendants' knowing

and willful violation of 16 CFR §1115.6.

99. Pursuant to 15 U.S.C. §2072, the plaintiffs are entitled to "recover damages sustained and

may, if the court determines it to be in the interest of justice, recover the costs of suit,

including reasonable attorneys' fees (determined in accordance with section 2060(f) of this

title) and reasonable expert witnesses' fees. . . ."

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally,

in an amount to be determined, plus prejudgment interest, exemplary damages, all taxable costs

and fees, reasonable attorneys' fees, reasonable expert witnesses' fees, and all other just and

equitable relief.

      Dated:  April 8, 2021

RON HARMEYER LAW OFFICE LLC
Attorneys for American Family Mutual
Ins. Co.

*electronically signed Ronald W. Harmeyer*

_____

By: Ronald W. Harmeyer
State Bar No. 1026579

330 E. Kilbourn Ave., Suite 1070
Milwaukee, WI 53202
Tel. (414) 316-2500
Fax (414) 755-7081
rharmeyer@ronharmeyerlaw.com

**EXHIBIT A**

| Insurer | Insured/ Loss location | Date of fire | Damages |
|---|---|---|---|
| American Family | Michael Buchholz 2946 N. Farwell Avenue Milwaukee, WI 53211 | October 3, 2020 | *Pending* |
| American Family | Richard Burger 5049 N Wendorf Road Monroe Center, IL 61052 | May 25, 2020 | $48,896.66 |
| American Family | James Crownover 229 S. Connecticut Street, Hobart, IN 46342 | July 19, 2019 | $196,744.38 |
| American Family | Linda Drall 14072 W. Tiffany Place New Berlin, WI 53151 | September 21, 2019 | $160,126.10 |
| American Family | Frederick Henderson W6338 Lakeshore Drive Tony, WI 54563 | December 28, 2019 | $112,502.12 |
| American Family Ryan and Aubree Ralph | Ryan and Aubree Ralph 1433 W. River Drive Stevens Point, WI 54481 | November 21, 2019 | $87,426.56 |
| American Family Briana Schock | Briana Schock 1432 90th Avenue Amery, WI 54001 | March 9, 2020 | $34,043.49 |
| American Family | Ruth Schock 1432 90th Avenue Amery, WI 54001 | March 9, 2020 | $63,624.44 |
| American Family | Patricia Schuenke 1513 Forest Avenue Beloit, WI 53511 | July 7, 2019 | $42,500.00 |
| American Family | Frank and Karen Zingale 1571 Wyandotte Avenue, Lakewood, OH 44107 | August 20, 2019 | $289,517.25 |
| Mt. Morris William and Aloha Seitz | William and Aloha Seitz 1433 W. River Drive Stevens Point, WI 54481 | November 21, 2019 | $68,529.12 |

| | | | |
|---|---|---|---|
| Secura | Christopher Clarkson<br>1432 90th Avenue<br>Amery, WI 54001 | March 9, 2020 | $10,519.99 |
| West Bend Mutual<br>Jean Wesley | 2964 N. Farwell Avenue<br>Milwaukee, WI 53211 | October 3, 2020 | $153,880.22 |